# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00435-COA

TAMESHIA SHELTON A/K/A TAMESHA SHELTON A/K/A MIKEY      APPELLANT

v.

STATE OF MISSISSIPPI      APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/18/2024 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | CLAY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | SANDRA KAY LEVICK |
| | WILLIAM TUCKER CARRINGTON |
| | JACOB WAYNE HOWARD |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 12/09/2025 |
| MOTION FOR REHEARING FILED: | |

EN BANC.

BARNES, C.J., FOR THE COURT:

¶1. Tameshia Shelton appeals the denial of her "Amended Petition for Post-Conviction Relief" by the Circuit Court of Clay County, Mississippi. Concluding that Issues I and II of Shelton's appellate brief have merit, we find that the circuit court erred in denying Shelton's motion for post-conviction collateral relief. We reverse the court's judgment and remand for a new trial.

## PROCEDURAL HISTORY

### A. 2015 Trial Proceedings

¶2. Shelton was tried for first-degree murder for the shooting of her sister's boyfriend,

Danelle Young, in July 2015. At trial, Dr. Lisa Funte, the medical examiner who performed Young's autopsy, testified that she had examined the gunshot wound and determined that it was consistent with a small-caliber handgun, such as a .22. While admitting it was possible Young committed suicide, but not probable, Dr. Funte opined that the manner of death was homicide based on a finding that the bullet pathway was straight back and down. Forensic scientist Felicia Robinson testified that the bullet had been fired from near contact against Young's chest in light of the burn marks. Jacob Burchfield with the Mississippi Forensics Laboratory also testified regarding the results of the gunshot residue (GSR) tests. Burchfield testified that Young's test revealed particles indicative of gunshot residue on the backs of his hands; Shelton's test revealed particles indicative of GSR on her palms, the back of her right hand, and her pajamas.[1]

¶3.    The jury found Shelton guilty of first-degree murder, and she was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. Shelton's conviction and sentence were affirmed by the Mississippi Supreme Court on March 16, 2017. *Shelton v. State*, 214 So. 3d 250, 259 (¶43) (Miss. 2017).

### B.    Post-Conviction Relief Proceedings

¶4.    On March 12, 2020, the Mississippi Innocence Project filed a petition with the supreme court on Shelton's behalf, seeking leave to file a motion for post-conviction relief

---

[1] Since this appeal concerns the post-conviction-relief proceedings, we have only discussed that  testimony relevant to the issues raised on appeal.

2

(PCR) with the circuit court. The petition was supported by affidavits from forensic pathologists and GSR experts, as well as an affidavit by the county district attorney, who attested that he believed the petition raised legitimate concerns about the reliability of Dr. Funte's opinion that the manner of death was homicide. The supreme court granted Shelton's request to file her amended motion in the circuit court on October 29, 2020.

¶5.     On November 10, 2020, Shelton filed her "Amended Petition for Post-Conviction Relief," seeking a new trial. Shelton argued: (1) Dr. Funte's testimony that the victim's manner of death was homicide is not supported by scientific evidence, and (2) her trial counsel's performance at trial prejudiced her defense. The circuit court conducted hearings on April 12, 2021; August 9, 2021; December 6, 2021; and April 13-14, 2021. The court denied Shelton's amended PCR motion on March 18, 2024.

¶6.     Shelton appeals the circuit court's judgment denying her PCR motion, raising four issues: (I) whether Dr. Funte's change in his expert opinion entitled Shelton to a new trial; (II) whether Shelton's trial attorney rendered ineffective assistance of counsel; (III) whether Shelton is factually innocent; and (IV) whether a witness's allegedly false testimony at trial deprived her of a fair trial.[2]

## STANDARD OF REVIEW

¶7.     In *Whitehead v. State*, 299 So. 3d 899 (Miss. Ct. App. 2020), this Court recognized

---

[2] For the sake of clarity and conciseness, we have consolidated some of the issues in Shelton's brief.

our standard of review in PCR cases:

> The Mississippi Supreme Court has established that "[o]n appeal, the appropriate standard of review for denial of post[-]conviction relief after an evidentiary hearing is the clearly erroneous standard." *Johns v. State*, 926 So. 2d 188, 194 (¶29) (Miss. 2006). The supreme court has explained that "[a] finding of fact is 'clearly erroneous' when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made." *Id*. at 196 (¶36).

*Id*. at 904 (¶15). However, the "proper standard of review" for issues of law is de novo. *Id*. (quoting *Kidd v. State*, 221 So. 3d 1041, 1043 (¶8) (Miss. Ct. App. 2016)). The PCR movant "has the burden of showing [s]he is entitled to relief by a preponderance of the evidence." *Id*.

## ANALYSIS

### I.    Whether the circuit court erred in finding Shelton is not entitled to a new trial based upon a change in Dr. Funte's expert opinion.

¶8.    Dr. Funte testified at trial as an "expert in the field of medicine specializing in forensic pathology." Based upon the autopsy findings, Dr. Funte opined that the cause of Young's death was "a gunshot wound to the chest" and that the manner of death was "homicide." Dr. Funte noted, "The wound path goes from the front of the body to the back of the body and downward. And there was no real significant deviation to the left side or to the right side. So it was pretty much straight back and down." When asked what the homicide determination was "based on," Dr. Funte testified that the opinion was based on the surrounding circumstances as outlined in the coroner's report, the absence of certain mental health history, and the pathway of the bullet. Dr. Funte explained:

4

So, in addition to the surrounding circumstances, some of the important information is the decedent's medical history. So, barring mental illness, depression, bipolar disorders, schizophrenia, a history of suicidal ideation or suicide attempts. What I look at is going to mean in this case more toward a homicide probably because of the lack of prior mental illness or suicide attempts as well as this pathway that the bullet traveled through the body.

When I do cases, it's well-documented. If the individuals, they had suicidal ideations, if they had suicidal thoughts, and they shoot themselves, I don't see clean straight back and down gunshot wound. There's some deviation from left and right. The pathway isn't quite as nice.

So with that information at the very least, I would still have called it undetermined. I cannot rule out homicide. In this case, I went with homicide.

Regarding the possibility that Young had committed suicide, Dr. Funte further opined:

You're going to shoot yourself in the chest. You have to be able to get the barrel against your chest. And the way you have to turn your wrist is going to deviate that bullet to the left or right, okay. If you do it with your left hand, the same thing happens. It's not going [to be] easy to get a straight back gunshot wound. When I see people who have shot themselves in the chest, the bullet goes to one side or the other. Because that's how he can most easily pull the trigger and hold the gun. **Is it possible for somebody to shoot themselves straight back? It's possible but not probabl[e]**. So that's one thing I can factor in.

(Emphasis added). Evidence also showed that Young had marijuana (or cannabis) in his system, but Dr. Funte could not say how it "specifically affected him" since "[e]verybody responds differently" to drugs.

¶9.    At the PCR evidentiary hearing, Shelton called Dr. Liam Funte to testify.[3]  Dr. Funte

[3] At the post-conviction hearing, Dr. Funte indicated that his first name is now Liam. Dr. Liam Funte indicated to the court that he previously went by the name Lisa Funte. For the purposes of the hearing, the trial court accepted that Dr. Liam Funte is the same person as Dr. Lisa Funte. Therefore, as in the parties' appellate briefs, masculine-form pronouns

told the circuit court that he had "re-visited" this case and had revised his opinion as to the manner of Young's death, testifying: "My current opinion is that the manner of death is undetermined." Noting the trajectory of the bullet in Young's case was relevant in determining the manner of death, Dr. Funte indicated, "It's an uncommon pathway. Or in my experience at the time, it was not something that I had seen in suicidal gunshot wounds." Dr. Funte testified he "had gained more experiences as well as . . . reviewed scientific articles regarding bullet trajectories in suicides and in homicides." Dr. Funte said he has since seen suicidal gunshot wounds to the left chest that have taken the same path as the one that killed Young.

¶10. Dr. Funte told the circuit court he was not aware of any scientific studies that supported his original opinion at trial as to the manner of death. Two studies relied upon to render the revised opinion as to the manner of death were admitted into evidence; both were published before Shelton's trial. Dr. Funte testified that a 2002 German study showed 36.4% of suicidal gunshot wounds to the left chest matched the path of the bullet in Young's case. As for the 2012 study published in the American Journal of Forensic Medical Pathology, Dr. Funte testified that the results of that study showed that the bullet pathway in Young's case exhibited the "third most common pathway" in cases of suicidal gunshot wounds to the chest. Thus, Dr. Funte opined, based upon the autopsy finding alone, that it is not possible to determine the manner of death. On cross-examination, Dr. Funte acknowledged that the

_____

will be used to refer to Dr. Funte.

bullet path as it relates to suicides was "uncommon," " but it is reported."

¶11.   Concluding that the statistics from the studies introduced into evidence strongly suggest that Young's death was a homicide, the circuit court determined that Dr. Funte's change of opinion as to the manner of death, as well as the evidence used to support the changed opinion, "does not merit a reversal in this case."  The court cited *Shelby v. State*, 311 So. 3d 613, 623 (¶43) (Miss. Ct. App. 2020), wherein this Court stated:

> We first address Shelby's contention that she is entitled to a new trial based on Dr. Riddick's changed opinion. **The trial court found that Dr. Riddick's change of mind would not probably produce a different result at trial, and we cannot say that the trial court clearly erred in this finding**. To begin with, the mere fact that Dr. Riddick changed his opinion does not require a new trial. *Howell v. State*, 989 So. 2d 372, 384 (¶33) (Miss. 2008) ("The fact that a witness changes his testimony after the trial does not necessarily entitle the petitioner to a new trial.") (footnote omitted). **A witness, whether expert or lay, does not have the power to nullify a criminal conviction by simply recanting prior testimony.** Indeed, "[a]s a general rule, recanted testimony is exceedingly unreliable, and is regarded with suspicion" and "skepticism." *Howell*, 989 So. 2d at 384 (¶33) (quotation marks omitted).

(Emphasis added).

¶12.   We find the circuit court erred in its findings.  In *Shelby*, the trial court had determined that the expert's "changed opinions were unreliable and unpersuasive" because there was "little evidence to support *any* such family history" of seizure disorders of the decedent. *Id*. at (¶44).  Here, on the other hand, the circuit court was not dealing with unreliable, recanted testimony from a prior fact witness. *See Roberson v. State*, 354 So. 3d 422, 426 (¶24) (Miss. Ct. App. 2022) (noting that a trial judge is typically "tasked with deciding if the witness was lying at trial or later at the PCR hearing").  Unlike the "unreliable" family medical history

7

relied on by the expert in *Shelby*, Dr. Funte relied on the bullet pathway *and* scientific studies reviewed since the trial in now opining that the manner of death is "undetermined."

¶13.    Dr. Funte stated (in part) in a sworn affidavit dated May 20, 2021:

> 6.  As I explain more fully below, I now regard my determination of the manner of death of Danelle Young to be in error.
>
> 7.  I was not made aware at or before the time that I testified in this case of published peer-reviewed studies that examine whether the trajectory of a gunshot through the left chest is a means of distinguishing homicidal from suicidal injuries. **I was not informed of studies that show that the absence of significant deviation to the left or to the right on the sagittal plane is not a basis to distinguish homicidal from suicidal gunshot wounds. I was not informed of studies that showed that the trajectory of the bullet that caused the fatal injuries to Danelle Young was entirely consistent with data on the path of the bullet in suicidal gunshots to the left chest.**
>
> . . . .
>
> 11.  I recall the prosecutor telling me in the courthouse shortly before my testimony that the Mississippi Crime Lab found soot on Mr. Young's garment. I do not recall being shown the actual report, although the transcript indicates that a report was shown to me in cross-examination. I have now reviewed the Mississippi lab's written distance determination report, its worksheet, and the testimony of Felicia Robinson of the Mississippi Crime Lab. The finding that the muzzle to garment discharge was of contact or near contact range is consistent with my present expert opinion that the manner of death of Danelle Young **is undetermined, but leaning toward suicide.**
>
> 12. . . . I lean toward suicide, but I cannot make that determination with certainty. **I see no evidence at this point to support homicide**.

(Emphasis added). Dr. Funte further testified during the PCR hearing that based on the results of the studies that he was not aware of at the first trial and additional years of experience in performing autopsies, it was now not possible for him to determine a manner

8

of death.  Dr. Funte explained to the trial court:

Q.  Is it still your opinion that the trajectory of the bullet in this case is a basis for determining that Mr. Young's death was homicide?

A.  It is not.

Q.  And why not?

A.  Since that time, I've . . . gained more experiences as well as . . . reviewed scientific articles regarding bullet trajectories in suicides and in homicides.

Q.  And what has your experience shown you?

A.  That any bullet trajectory can occur in both homicides and suicides.

Q.   And have you seen suicidal gunshot wounds to the left chest that have taken the same path as the bullet that killed Mr. Young?

A.  Yes.

Dr. Funte also admitted that he was unaware of the size of the weapon at trial, and he demonstrated how the gun could be held in a way that could enable someone to shoot himself in that manner.  Dr. Funte further rejected his previous reliance on any absence of evidence of mental illness or suicidal ideation as a basis for concluding Young's manner of death was homicide at trial.

¶14.   "At an evidentiary hearing on a PCR motion, the petitioner bears the burden of proving 'by a preponderance of the evidence that he is entitled to the relief.'" *Roberson*, 354 So. 3d at 426 (¶23) (quoting Miss. Code Ann. § 99-39-23(7) (Rev. 2020)).  In this instance, we find Shelton has met this burden and is entitled to a new trial based on Dr. Funte's recanted expert opinion, in which he now determines that none of the materials reviewed for

9

the evidentiary hearing support the examiner's original conclusion that the manner of death was homicide.

¶15.    In its finding, the trial court reasoned "that there were other evidentiary supports for the jury's verdict."  In Shelton's direct appeal to the Mississippi Supreme Court, the court rejected Shelton's argument that the verdict was against the weight of evidence based on the forensic evidence presented at trial.

> The forensic evidence presented at trial demonstrated that Shelton had shot Young. *In addition, the trajectory of the bullet through Young's body made the theory of suicide highly unlikely.  Further, Young did not have any known mental illnesses and had not attempted suicide.*  Weighing the evidence "in the light most favorable to the verdict," we conclude that the verdict is not against the weight of the evidence.

*Shelton*, 214 So. 3d at 257 (¶38) (emphasis added).  Furthermore, in the current PCR proceedings, the trial court thoroughly discussed the studies regarding the statistical probabilities of whether the wound in question could be caused by suicide or homicide.

¶16.    Yet the State was required at trial to prove that Shelton murdered Young *beyond a reasonable doubt*.  Dr. Funte, the forensic pathologist charged with determining the cause and manner of death, has now recanted his prior opinion from trial that the manner of death was homicide, withdrawing a crucial piece of the evidentiary foundation upon which the State's case rested.  When arguing against the defense's motion for a directed verdict, the State asserted that "as far as the evidence that has come in, Dr. Funte testified that this was in fact ruled a homicide based on the wound path through the body that the - - to [Dr. Funte] it was not a suicide simply due to the fact there was no deviation whatsoever on the shot that

10

went through [Danelle] Young's body." The State also asserted in closing arguments:

> So we know it wasn't a suicide; why? Once again circumstantial evidence.

> [Dr. Funte] told you no left-right deviation. In order for it to have been a suicide even though up against his chest, it would have been a very awkward angle for it to be a perfect path with no with no left or right deviation.

> . . . .

> And what did [Dr Funte] tell you? It's homicide. Even after you hear the distance determination you know it was pressed up against him. Does that change your opinion? It's homicide its not suicide. [Dr. Funte] was definitive about it. It wasn't a maybe or it wasn't any of this. [Dr. Funte] didn't want - - I would still rule it a homicide today. That's what it was.

We thus find it apparent that the State substantively relied on this testimony by Dr. Funte that the manner of death was "homicide"—testimony that Dr. Funte has since revised to "undetermined" based on newly obtained scientific knowledge.[4]

¶17. Accordingly, we find that the circuit court clearly erred in holding that the revised expert opinion testimony by Dr. Funte "does not merit a reversal." We reverse the court's ruling, and we remand for a new trial.

## II.     Whether defense counsel rendered ineffective assistance.

¶18. Shelton contends that she received ineffective assistance of counsel at trial due to her defense counsel's failure to (i) prepare to challenge Dr. Funte's determination of the manner

---

[4] We also consider Dr. Funte's revised opinion to be new scientific evidence not available at trial. *See Ex parte Robbins*, 478 S.W.3d 678, 690 (Tex. Crim. App. 2014) (finding that a medical examiner's revising her cause-of-death determination from "homicide" to "undetermined," based on her updated scientific knowledge, was considered new scientific evidence not available at trial).

11

of death,[5] (ii) review critical GSR evidence available in discovery, (iii) prepare to contest the GSR evidence, and (iv) prepare and present certain other evidence. For a defendant to prevail on a claim of ineffective assistance of counsel, "the defendant must show that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, defense counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. Additionally, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. Therefore, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (quotation marks omitted).

¶19. Our resolution of Issue I is dispositive to this appeal, and our remand moots all but one claim of ineffective assistance that we find has merit—Shelton's argument regarding trial counsel's failure to submit into evidence a letter purportedly written by Young. This letter, which Shelton claimed she discovered in her child's baby book a few months after Young's death,[6] states in pertinent part: "I pretty much gotta start my life over again. I have no life without [Ketina, Shelton's sister]. **These are my last words**. . . . Tell Trin I said Bye and

---

[5] This allegation includes counsel's failure to obtain expert witnesses (e.g., Dr. Randall Frost, who testified at the PCR hearing that Young's injury was "completely consistent with a self-inflicted wound.").

[6] Shelton's child was born on May 6, 2009. Young visited Shelton in the hospital, but he did not return to her house until October 12, 2009, days prior to the shooting.

be a good girl ok. Tell Treasure about me one day. Bye Bye." (Emphasis added). At the evidentiary hearing, Shelton produced a report and testimony by handwriting expert Grant Sperry, who identified Young as the person who wrote the letter; the letter's contents indicate it was written in close proximity to the time of his death.

¶20.    Shelton contends that although she gave her trial attorney a copy of this letter before trial, defense counsel did not give any consideration to the letter until the second day of trial. Shelton noted in her affidavit:

> On the second day of trial I went home to bring the original note to the courthouse. I saw [my attorney] discussing the note with the prosecutor while the jury was not present. Judge Kitchens was on the bench.

In her PCR motion, Shelton asserted:

> What efforts [defense counsel] may have made to introduce the note were unsuccessful. No record was made of his attempts. The discussion he had in the courtroom with one or both district attorneys was not conducted in the presence of a court reporter, although the judge was on the bench. It may be that the prosecutors objected to having the letter sprung on them in the middle of trial. It may be that [my trial attorney] was as ill-prepared to defend the admissibility of the note as he was to authenticate its genuineness.

Shelton's trial attorney did testify at the PCR hearing that the letter was important because "it somewhat corroborated through a couple of sentences our theory that suicide may have been on Mr. Young's mind." Although her attorney wanted to introduce the letter through Shelton's testimony, Shelton decided not to testify. Shelton's trial attorney testified that the trial court would not allow him to introduce the letter.

¶21.    However, reviewing the record, we cannot find where the admissibility of this letter

13

was argued and decided at trial. While defense counsel questioned Young's girlfriend (and Shelton's sister), Ketina Tutton, about a "note" Young had written to her after the couple had a disagreement, it does not appear from the context of the record that note is the same document as the letter in question.[7] Thus, it is unclear if this is the evidence to which Shelton's trial attorney refers when saying the trial court would not allow Young's letter into evidence. We therefore agree with Shelton's contention that "the transcript does *not* show that [Shelton's trial counsel] ever questioned any witness about the letter. Nor does the record disclose that he made any efforts at all to secure its admission into evidence."

¶22. We further disagree with the State's argument that the letter would be "irrelevant." Young's state of mind around the time of the shooting would be crucial to Shelton's defense that Young committed suicide. This Court has recognized:

> First, a victim's state of mind is at issue when it goes to a material element of the crime. Second, the victim's state of mind may become relevant to an issue in the case where the defendant claims: (1) self-defense; (2) **that the victim committed suicide**; or (3) that the death was accidental." Charles W. Francis III, *Submitting to Legal Authorities: The Difference Between Interpretation of Federal Rule of Evidence 803(3) and Application of Mississippi Rule of Evidence 803(3)*, 81 Miss. L.J. 1597, 1603 n.32 (2012).

*Dille v. State*, 334 So. 3d 1162, 1179 (¶38) (Miss. Ct. App. 2021) (emphasis added). In this case, there was a letter supporting the defense's theory that Young committed suicide. The content of the letter was relevant, particularly in light of Ketina's testimony that Young was upset when she told him shortly before the shooting that she had been hired for a job and

---

[7] The trial attorney did not ask Ketina to identify Young's handwriting on the note.

14

would not be moving with him in a couple of months to Meridian "like [they] had previously planned." But according to affidavits by Shelton and her family members, trial counsel only asked Shelton to produce the original letter on the second day of trial, and the trial transcript contains no discussion of the letter either from a procedural or substantive standpoint. As noted by Dr. Funte at the trial, "a history of suicidal ideation" would have been relevant to the examiner's determination of the manner of death. Considering the potentially exculpatory nature of this letter, we find it difficult to conclude that its absence did not prejudice Shelton's defense.

¶23.   We find Shelton's remaining claims of ineffective assistance (e.g., failure to prepare a defense, to object, and to rebut certain evidence) are moot based on our decision to remand for a new trial.

### III.   Whether Shelton is "factually innocent."

¶24.   Without citing any Mississippi caselaw in support of this issue, Shelton contends that in light of the testimony and evidence placed before the court in support of Shelton's PCR motion, "it offends the Eighth and Fourteenth Amendments to execute a person who could prove his actual innocence, then it offends the Constitution as well to consign her to prison for the remainder of her natural life for a crime she did not commit." Shelton claims that she "is factually innocent" of murder because "[i]t is more likely than not that no reasonable jury that heard the entirety of the evidence presented at trial and in post-conviction relief would find beyond a reasonable doubt that Ms. Shelton murdered Mr. Young."

15

¶25. The Mississippi Supreme Court rejected a similar argument by a petitioner in *Howard v. State*, 945 So. 2d 326, 369-70 (¶95) (Miss. 2006), holding:

Howard next "alleges actual innocence to the charges, which have been brought against him by the State of Mississippi, and in support of his claim he relies on newly discovered evidence. . . . The newly discovered evidence is of constitutional dimension and necessitates that this Court extend the actual innocence exemption to procedural default of constitutional claims contained in his petition." **Howard cites several United States Supreme Court and federal court decisions on the "actual innocence" exception to the procedural bar raised in successive, abusive or defaulted federal habeas claims**. We are not sure what Howard is attempting to add with this argument. **However, even if the federal habeas cases applied here, Howard has failed to prove that he is actually innocent.** Howard contends that he has "presented a factual basis for his claim of actual innocence based on the new evidence discovered during the post-conviction investigation. . . . [E]ven if these allegations were true, it still does not prove that Howard is actually innocent of the charges.**

(Emphasis added). The same is true in the present case. In *Mason v. State*, 235 So. 3d 129, 132 (¶7) (Miss. Ct. App. 2017), this Court found:

"[I]t is important to note . . . that 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To establish actual innocence, [a] petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id*. (quotation marks omitted).

Because Shelton has failed to demonstrate, in light of all the evidence, that it is more likely than not that Young committed suicide, we find this argument is without merit.

¶26. We find Shelton's remaining issue is moot based on our disposition.

**Conclusion**

¶27. Finding the court committed clear error in denying Shelton's PCR motion, we reverse

the judgment and remand to the circuit court to vacate the judgment of conviction and proceed with a new trial.

¶28. **REVERSED AND REMANDED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY AND LASSITTER ST. PÉ, JJ., CONCUR. WEDDLE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LAWRENCE AND WEDDLE, JJ.**

**EMFINGER, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶29. Because I would affirm the trial court's denial of Shelton's claims for post-conviction collateral relief for the reasons set forth below, I respectfully dissent as to the majority's result. Although the majority opinion does not address all the issues raised by the appellant, I will address them below because I would affirm the trial court's decision.[8]

**Analysis**

¶30. Shelton contends that the trial court erred by denying her amended petition for post-conviction relief. She raises four issues that will be addressed separately below.

> **I.   Is Shelton entitled to a new trial based upon a change in the medical examiner's expert opinion?**

¶31. Shelton was convicted of the first-degree murder of Danelle Young. Dr. Funte, who at the time was a medical examiner for the State of Mississippi, performed the autopsy on Young and testified as an expert at trial, as noted by the majority. Dr. Funte testified that the

---

[8] For ease of reference, many quotes from cases and testimony of witnesses cited by the majority will be repeated herein.

17

cause of Young's death was "a gunshot wound to the chest" and that the manner of death was "homicide." Dr. Funte further testified on direct examination at trial:

> The wound path goes from the front of the body to the back of the body and downward. And there was no real significant deviation to the left side or to the right side. So it was pretty much straight back and down.

¶32. On cross-examination, Dr. Funte testified that Young had marijuana (or cannabis) in his system, which indicated that at some point prior to his death, he had been smoking marijuana. When asked the basis for his opinion that Young's death was a homicide, Dr. Funte identified several things that influenced his opinion and several things that did not. The gunshot residue (GSR) testing on Young's clothing was not available when he wrote his report, but when shown that report, Dr. Funte indicated that it did not affect his opinion. Dr. Funte stated that the coroner's report indicated that there had been an argument and a gunshot wound. According to Dr. Funte, "So, obviously one of the questions that I'm going to have right off is this a self-inflicted gunshot wound? Or is this a gunshot wound caused by the intervention of some other individual?" He further explained:

> So, in addition to the surrounding circumstances, some of the important information is the decedent's medical history. So, barring mental illness, depression, bipolar disorders, schizophrenia, a history of suicidal ideation or suicide attempts. What I look at is going to mean in this case more toward a homicide probably because of the lack of prior mental illness or suicide attempts as well as this pathway that the bullet traveled through the body. When I do cases, it's well-documented. If the individuals, they had suicidal ideations, if they had suicidal thoughts, and they shoot themselves, I don't see clean straight back and down gunshot wound. There's some deviation from left and right. The pathway isn't quite as nice. **So with that information at the very least, I would still have called it undetermined. I cannot rule out homicide. In this case, I went with homicide.**

18

(Emphasis added). Dr. Funte admitted that he often relies upon the information he is given by the coroner and law enforcement. When questioned further on cross-examination about Young having used marijuana, Dr. Funte explained that he did not know how that may have affected Young because people respond differently.

¶33. On redirect examination, when asked about the possibility that Young had committed suicide, Dr. Funte explained:

> You're going to shoot yourself in the chest. You have to be able to get the barrel against your chest. And the way you have to turn your wrist is going to deviate that bullet to the left or right, okay. If you do it with your left hand, the same thing happens. It's not going [to be] easy to get a straight back gunshot wound. When I see people who have shot themselves in the chest, the bullet goes to one side or the other. Because that's how he can most easily pull the trigger and hold the gun. **Is it possible for somebody to shoot themselves straight back? It's possible but not probabl[e]**. So that's one thing I can factor in.

(Emphasis added).

¶34. Shelton called Dr. Funte to testify at the evidentiary hearing in support of her motion for post-conviction relief. Dr. Funte told the court that he had "re-visited" this case and had revised his opinion as to the manner of Young's death, testifying: "My current opinion is that the manner of death is undetermined." Dr. Funte testified that the trajectory of the bullet in Young's case was relevant in determining the manner of death. Dr. Funte indicated that "[i]t's an uncommon pathway. Or in my experience at the time, it was not something that I had seen in suicidal gunshot wounds." Dr. Funte testified that he "had gained more experiences as well as have reviewed scientific articles regarding bullet trajectories in

19

suicides and in homicides." Further, he stated that he had seen suicidal gunshot wounds to the left chest that took the same path as the one that killed Young. Dr. Funte testified that he was relying on his own experience when he opined that Young's manner of death was homicide. Dr. Funte also told the court during his direct examination that he was not aware of any scientific studies that supported his original opinion. At that point, two studies upon which he relied to render his revised opinion were admitted into evidence.[9] Both were published *before* Dr. Funte's testimony in Shelton's original trial. He testified that the 2002 German study showed 36.4% of suicidal gunshot wounds matched the path of the bullet in Young's case. As for the 2012 study published in the American Journal of Forensic Medical Pathology, Dr. Funte testified that the results of that study showed that the bullet pathway in Young's case exhibited the "third most common pathway" in cases of suicidal gunshot wounds to the chest. Dr. Funte testified that his opinion now is that based upon his autopsy finding alone, it is not possible to determine the manner of death.

¶35.    On cross-examination Dr. Funte was questioned about the reports he relied upon. There were several questions and answers concerning what the reports revealed about gunshot wounds to the chest in apparent suicides:

Q.    So, more than likely if there's a gunshot wound, it won't be parallel because two-thirds of them are not parallel; is that correct?

A.    That is a correct statement, yes.

---

[9] As will be discussed, the trial court found that these studies actually support Dr. Funte's original opinion.

. . . .

Q.    And you've testified today that it's still uncommon and odd for this bullet path to be with a suicide, correct?

A.    It is not something that I see often although I have seen it. And as we discussed, it's a third of the cases the trajectory reported in the cases in these studies. So, it's not common, but is reported.

. . . .

Q.    But I'll just state to you also—and you can look to see if this lines up to 82.4 percent of the suicides were shots to the head. And I say 82.4 percent of the suicides by firearms, or single-shot. I think is how the study breaks it down?

A.    Yes.

Q.    Does that sound correct to you?

A.    Yes.

Q.    And only 16.3 single-shot suicides by firearm were shots to the chest, 16.3 percent. Does that sound right?

A.    Yes.

Q.    So, according to that study, looking at those numbers, if it was a suicide, it would have been much more likely to be a shot to the head than to the chest, correct?

A.    Yes. According to the study.

. . . .

Q.    And in that study, the 2012 study that you're looking at, it also says that of the 67 subjects that were in that study—now, those were confirmed suicides?

A.    Yes.

21

Q.     So, of the 67 subjects, there were only 10 that had a downward parallel path; which would be what we saw here with the decedent; is that correct?

A.     Correct. Yes.

Q.     So, only 10 out of 67, correct?

A.     Yes.

Q.     My math, that's less than 15 percent. Does that sound right?

A.     Yes.

Q.     So, would you agree that it's pretty rare, that it would follow the bullet path and make suicide through the left chest would follow that bullet path?

A.     Yes. It is an uncommon path.

Q.     So, it [is] much more likely if it was a suicide through the left chest, that [it] would have had some deviation somewhere or another, correct?

A.     Yes. And we discussed that to left and right [has] a greater percentage [than] to parallel.

Q.     Right. And 85 percent is certainly a lot bigger than 15 percent, correct?

A.     Yes, sir.

Q.     So, much more like[ly] that it would have had some deviation, right?

A.     Yes.

¶36.   To the extent that Shelton claimed that Dr. Funte's changed opinion constituted newly

22

discovered evidence,[10] the trial court cited *Kidd v. State*, 221 So. 3d 1041, 1043 (¶9) (Miss. Ct. App. 2016), as setting forth Shelton's burden of proof on this issue:

> Mississippi Code Annotated section 99-39-23(6) (Rev. 2015) defines newly discovered evidence as "evidence, not reasonably discoverable at the time of trial, **which is of such nature that it would be practically conclusive that, if it had been introduced at trial, it would have caused a different result in the conviction or sentence**." A movant seeking a new trial based on a newly-discovered-evidence claim must show:
>
> > (1) the new evidence was discovered after the trial; (2) it could not by due diligence have been discovered prior to trial; (3) it is material to the issue and not merely cumulative or impeaching; and (4) **[it] will probably produce a different result or verdict in the new trial**.
>
> *Van Norman v. State*, 114 So. 3d 799, 801 (¶11) (Miss. Ct. App. 2013) (citing *Crawford v. State*, 867 So. 2d 196, 203-04 (¶9) (Miss. 2003)).

(Emphasis added). The court noted that at trial, Dr. Funte had testified that given the bullet trajectory, it was possible that Young's death was the result of suicide, but it was not probable. However, at trial, Dr. Funte opined that the manner of death was homicide. At the evidentiary hearing, Dr. Funte stated that he is now of the opinion that the manner of Young's death should be stated as "undetermined." The trial court went on to note that neither at trial nor at the evidentiary hearing could Dr. Funte rule out homicide. The court noted that the statistics from the studies that were introduced into evidence and were relied on by Dr. Funte in reaching his new opinion strongly suggest that Young's death was a

---

[10] Shelton's related claim of ineffective assistance of counsel regarding Dr. Funte's trial testimony concerning the manner of Young's death is addressed later.

homicide rather than a suicide. Therefore, the trial court found that Dr. Funte's change of opinion and the evidence used to support the changed opinion did not merit reversal. The trial court also cited *Shelby v. State*, 311 So. 3d 613, 623 (¶43) (Miss. Ct. App. 2020), where this Court stated:

> We first address Shelby's contention that she is entitled to a new trial based on Dr. Riddick's changed opinion. **The trial court found that Dr. Riddick's change of mind would not probably produce a different result at trial, and we cannot say that the trial court clearly erred in this finding**. To begin with, the mere fact that Dr. Riddick changed his opinion does not require a new trial. *Howell v. State*, 989 So. 2d 372, 384 (¶33) (Miss. 2008) ("The fact that a witness changes his testimony after the trial does not necessarily entitle the petitioner to a new trial."). **A witness, whether expert or lay, does not have the power to nullify a criminal conviction by simply recanting prior testimony.** Indeed, "[a]s a general rule, recanted testimony is exceedingly unreliable, and is regarded with suspicion" and "skepticism." *Howell*, 989 So. 2d at 384 (¶33) (quotation marks omitted).

(Emphasis added) (footnote omitted).

¶37.    A review of Table 8 of the 2002 article shows that 73.5% of deaths caused by gunshot wounds to the chest were determined to be homicides, while only 26.5% were determined to be suicides. Thus, at the outset, because Young died from a single gunshot wound to his chest, statistics show that the manner of his death was probably a homicide.  Table 6 also supports this conclusion because it shows that 83.4% of suicides were the result of gunshot wounds to the head or neck, while only 16.3% were to the chest. Table 10 shows that of the suicides resulting from gunshot wounds to the left chest, only 36.4% matched the bullet path in Young's case, while 63.6% did not. The 2012 article is even more supportive of a homicide in Young's case, by showing that less than 15% of suicides where the death is

24

caused by a chest wound have the same bullet trajectory as is present here. Just as Dr. Funte testified at trial, these studies indicate that while it is possible the bullet trajectory could have been the result of a suicide, it is not probable.

¶38. Shelton had the burden to prove that Dr. Funte's changed opinion would "**probably produce a different result or verdict in the new trial**." *See id*. At 622 (¶40). Based upon the testimony and other evidence produced at the hearing, the trial court found that Dr. Funte's changed opinion did not merit reversal in this case. I cannot find that the trial court was clearly erroneous in this regard.

## II. Is Shelton entitled to a new trial as a result of the State presenting and failing to correct false testimony?

¶39. Citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959), Shelton contends that her Fourteenth Amendment rights were violated by the State's "presenting, and failing to correct, false testimony from Ramirez Williams." Ramirez Williams (Williams) was the chief investigator for the Clay County Sheriff's Department during his investigation of the death of Young and was Chief Deputy at the time he testified at trial and during the PCR evidentiary hearing. Williams testified at Shelton's trial on July 15-16, 2015, almost six years after the date of the crime. Shelton contends that Williams' testimony that he tested Shelton's hands for GSR around 1 a.m. on October 17, 2009, at the sheriff's office, was false. As evidence that Williams provided false testimony in this regard, Shelton points to a form that was apparently contained in the gunshot residue kit that had been sent to the Mississippi Forensics Laboratory. This form stated that the sample had been taken from Shelton at 9:51

25

p.m. on October 16, 2009.

¶40.	At trial Williams testified that he was dispatched to the scene of the killing just minutes after 9:00 p.m. on October 16. Williams stated that he took an initial recorded statement from Shelton outside her residence because several people were in her trailer. The first statement Williams took from Shelton started at 9:33 p.m. After he finished that interview with Shelton, she went back into her trailer. Because Williams wanted to take a more detailed statement from her, he had Shelton transported to the sheriff's department. Once Shelton was taken out of the trailer, Williams asked her family to bring her some clothing because he was going to take the clothing she was wearing. Deputy Torrey Williams (T. Williams) and Sergeant Cassandra Smith transported Shelton from her trailer directly to the sheriff's department. T. Williams testified that he had been told by the investigators that he should not allow Shelton to go to the bathroom or wash her hands. Smith testified that she stayed with Shelton until Ramirez Williams came to conduct another interview with her; however, Smith told the jury that she did allow Shelton to go to the bathroom unsupervised. Smith could not say whether Shelton washed her hands at that time. The second interview started at 12:22 a.m. on October 17 and lasted thirty-eight minutes. Williams stated that he took the GSR samples from Shelton, sealed them in an envelope, and sent them to the crime lab. According to Williams, the samples were taken after the second interview, sometime around 1 a.m., "*to my knowledge.*" While Williams' response showed that he was not positive as to the time he took the GSR samples, there were no more questions asked concerning the

26

time the samples were collected. The test kit was admitted into evidence through the testimony of the State's last witness, forensic expert Jacob Burchfield. Burchfield testified that the kit had not been opened since he resealed it after testing was complete on March 19, 2010. There is no evidence that either Williams, the State, or Shelton's counsel had seen the GSR collection form between the time the samples were taken and Williams' testimony at trial.

¶41.   At the evidentiary hearing on the PCR motion, on April 13, 2022, Burchfield was shown the same GSR kit he had been shown at trial, and he again testified that the kit had not been opened since he sealed it in 2010. Burchfield testified that the sheet containing the information about who collected the GSR sample and the time it was collected is usually completed by the agency that collected the samples and would be sealed in the GSR kit.[11]

¶42.   At the PCR hearing, Williams was shown the form at issue by Shelton's counsel and questioned about it. Williams testified that he recognized the form and knew what it was. Williams told Shelton's counsel that he signed the form and completed the top portion of the form. Williams acknowledged that the form states the GSR sample was collected at 9:51 p.m. on October 16, 2009. On cross-examination, when asked by the State if he usually collects

_____

[11] It is unclear how the GSR collection form was obtained by Shelton's defense team. The kit remained unopened after it was sealed at the lab after testing was complete in 2010. A pleading Shelton filed indicated that it was obtained from a case file at the crime lab through discovery, before the PCR motion hearing. Whether this was a copy of the original form that had been somehow separated from the test kit, or whether this was a copy of the form that had been placed back into the test kit, I don't know. In any event, the State did not object to the introduction of the form at the PCR hearing.

27

GSR samples at the scene or if he usually waited, Williams responded by describing the scene in this case. Shelton was in her trailer with other people around. Williams knew Shelton had a new baby, and since she may have had to do something with the baby (to change the baby or use wipes) he may have taken the GSR sample at the scene. However, he concluded by saying, "I'm not 100 percent sure. I mean, I could have done it there. I could have [done] it at the office. . . . But I do know I did it." As to who completed the form, Williams testified that when he is collecting the sample, he has to put on gloves and usually hands the form to another deputy to complete. In looking at the form in this case, Williams said the top part was in his handwriting, but the bottom part (which states the time and date the sample was collected) was in "Brad's" handwriting.[12] Williams testified that the form was sealed in the envelope with the collected samples and sent to the crime lab. After the crime lab completed its testing, the package was resealed and sent back to the sheriff's department. When asked whether anyone had opened the envelope after it was returned to the sheriff's department, Williams said that would usually be done in the presence of both the district

---

[12] Shelton's counsel did not ask Williams to identify the "Brad" who Williams said completed the critical portion of the form. At the PCR motion hearing, Shelton did not produce any law enforcement witness named "Brad." However, I note that Deputy Brad Pettit testified for the State at Shelton's trial. Pettit's testimony showed that he was present at the scene with Williams and assisted in recovering physical evidence. However the only physical evidence that Pettit testified he was involved in collecting at the crime scene that night were "live rounds" and a shell casing. Pettit was not asked and did not mention any involvement in the collection of GSR samples on the night of the shooting. Pettit also testified that he took a statement from Shelton's sister that night at Williams' request, shortly after midnight.

attorney and the defense attorney if they wanted to view the contents prior to trial. If they had opened it, it would have been resealed with a date and the initials of whoever opened it. He said that the package in this case had not been reopened after it left the crime lab. Thus, Williams had not had the opportunity to review the form prior to his trial testimony.[13] Even at the evidentiary hearing, as noted above, the package was in the same condition as it was when the crime lab resealed it in early 2010.

¶43.    One of the prosecuting attorneys from trial, Mark Jackson, was called to testify by the State. He testified that his questioning and arguments at trial were based on the discovery in this case and on what he was told during pretrial meetings with witnesses. Based upon that information, Jackson believed what Williams told him, that Shelton's GSR sample was taken at the office around 1 a.m. on October 17, 2009. Jackson indicated that he did not recall having ever seen the form that indicated the sample was taken at 9:51 p.m. at the scene. Having considered the form he was shown at the PCR hearing and the prior statements made by Williams and other officers, Jackson testified at the PCR motion hearing, "I don't know whether 9:51's correct or whether around 1:00 is correct." But the bottom line was that Jackson did not know about the time on the form at the time of trial and had no reason to question Williams' testimony.

---

[13] However, there is a report authored by Williams contained in the PCR record. Williams would have had access to this report prior to his testimony. In this report, Williams states that the GSR sample was taken from Shelton at the sheriff's department. The report does show the date it was written.

¶44.    In *Howell v. State*, 163 So. 3d 240, 244 (¶1) (Miss. 2014), the defendant had been convicted of murder and sentenced to death. After his conviction and sentence were affirmed on direct appeal, Howell filed a motion for post-conviction collateral relief, which was granted in part by the supreme court. *Id*. Several specific issues were remanded to the circuit court for an evidentiary hearing. *Id*. One of Howell's issues that was remanded for an evidentiary hearing was his contention that the State had committed a *Napue* violation at trial.[14] *Id*. at 252 (¶28). The trial court denied Howell's claim for relief. On appeal the supreme court stated:

> Howell maintains that Police Chief David Grisham lied about the presence of counsel at the lineup and that "the State has, at the very least, stood by as Grisham made these statements repeatedly." He asserts that the State "had every indication that Grisham's statements were false." Grisham testified at the evidentiary hearing that he could have been mistaken but that he did not lie to the court when he said that Russell was present at the lineup. At the time of the hearing, Grisham still believed that Russell was there. **Howell did not present any evidence that Grisham intentionally lied or that the State knew that an attorney was not present at the lineup.** The issue is without merit.

*Id*. at 252 (¶29) (emphasis added).

¶45.    After hearing the testimony and reviewing the evidence presented by Shelton, the trial court found it "cannot say that the State knowingly elicited false testimony." The trial court also stated that Shelton had not met her burden to prove Williams' testimony at trial was

---

[14] *Napue*, 360 U.S.at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." (citations omitted)).

false. Based upon the facts stated above, I agree. Just as in *Howell*, there was no proof that Williams "intentionally lied" when he testified at trial that he collected the GSR samples around 1 a.m. on October 17, 2009. Further, there was no evidence presented by Shelton to show that the State knew Williams' trial testimony was false. Therefore, I cannot find that the trial court's ruling on this issue was clearly erroneous.

### III. Is Shelton entitled to a new trial based upon her contention that she is "factually innocent"?

¶46. I concur with the majority's finding that Shelton failed to prove that she is "actually" innocent. This issue is without merit.

### IV. Is Shelton entitled to a new trial because she received ineffective assistance of counsel at trial?

¶47. Shelton contends that she received ineffective assistance of counsel at trial due to her counsel's failing to prepare to challenge the manner-of-death determination, failing to review critical GSR evidence available in discovery, failing to prepare to contest the GSR evidence, and failing to prepare and present defense evidence. In *Rasberry v. State*, 405 So. 3d 1281, 1289-90 (¶¶29-30) (Miss. Ct. App. 2025), this Court set forth the burden Shelton must meet to be granted relief:

> To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) "that counsel's performance was deficient"—i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"—and (2) that he was prejudiced as a result—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant "bears the burden of proving both prongs of *Strickland*." *Ravencraft v. State*, 989 So. 2d 437, 443

31

(¶31) (Miss. Ct. App. 2008). "If either prong is not met, the claim fails." *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006).

In addition, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Therefore, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. (quotation marks omitted).

And in *Strickland*, 466 U.S. at 689-90, the United States Supreme Court warned:

Judicial scrutiny of counsel's performance must be highly deferential. **It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.** *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982). **A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.** Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, *supra*, 350 U.S. [91,] 101 (1955). There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See* Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L. Rev. 299, 343 (1983).

(Emphasis added). Further, this Court said in *Norton v. State*, 394 So. 3d 1057, 1060 (¶8)

(Miss. Ct. App. 2024):

The standard of review for claims of ineffective assistance of counsel is de novo. *Latham v. State*, 299 So. 3d 768, 772 (¶12) (Miss. 2020). "To prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was both deficient and prejudicial." *Id*.

32

I will address the specific claims raised by Shelton below.

### A.  Counsel's failure to prepare to challenge the manner-of-death determination is not reversible error.

¶48.  Shelton contends that "Dr. Funte's manner of death opinion was open to challenge and rebuttal." She argues that "experts and research were readily available to demonstrate to the jury that his opinion was faulty and to provide reasons to doubt that Mr. Young had been murdered." Shelton claims:

> Had trial counsel conducted the reasonable investigation to which Ms. Shelton was entitled under the Sixth Amendment, he would have been armed to challenge Dr. Funte's trial testimony and to present expert testimony in the defense case to raise a reasonable doubt that Mr. Young had been the victim of a homicide *and* reasons to believe that he committed suicide. Dr. Frost's testimony and the affidavits of Dr. Bux and Dr. Filkins demonstrate what could have been shown. But the circuit court entirely ignored the testimony and attestations of these experts. This was reversible error.

¶49.  Shelton called her trial counsel, Rod Ray, to testify at the PCR evidentiary hearing. Ray testified that he believed Shelton was innocent. Ray believed that the State's inability to show that Shelton had a motive to kill Young was an important part of her defense. He believed that showing the State was "grasping at straws trying to figure out what happened" was an important part of Shelton's defense. Ray testified that Shelton's call to 911 "was the most telling thing in this case from a defense standpoint." In response to Shelton's PCR counsel's questions, Ray stated:

> I thought why would somebody call 911 and stay on the phone for, I think it was 17 minutes, begging people to come to the scene and talk to the one person in the world who could say who did it or who did not do it? That to me was stark and led me to believe that I don't think she did this and, you know,

33

I tried to harp on that in the trial.

Ray testified that the 911 recording showed that Shelton was hysterical and was frustrated because help was not coming quickly enough. The following exchange occurred during Shelton's direct examination of Ray:

> Q. And as a result of those things, motive and your assessment of the case, the 911 call, your explanation for the decedent's death in this case was suicide?
>
> A. Yes. That's what our theory was.

¶50. When specifically asked about his assessment of Dr. Funte's manner-of-death opinion, Ray recognized that his opinion was based upon there being no deviation in the bullet path. Ray also acknowledged that Dr. Funte's opinion that the manner of death was homicide was an important aspect of the case. However, when asked if he believed that to be a problem for the defense, Ray testified:

> Not so much as the two problems, the gunshot residue and the multiple statements. Those were the two big problems to me, not that so much.

Ray also told the court that he did not ask an expert to review Dr. Funte's report and did not talk to Dr. Funte until the morning of trial, before Dr. Funte testified.

¶51. On cross-examination Ray again talked about his trial strategy. He stressed the fact that the State could not show a motive and the importance of the 911 call made by Shelton. He testified that his strategy was to have the jury focus on the absence of a motive and Shelton's 911 call rather than "them thinking about the gunshot residue or Dr. Funte." He told the State that his experience in trying cases in the district taught him that juries grow

34

bored with expert testimony and instead look for some fact to "hone in on." He stated:

> So, my strategy was as it is, typically, give the jury something to look at to focus on, and that's what I did - - that's what I tried to do in this case.

Ray explained that after speaking to Dr. Funte, prior to his testimony at trial, he found that Dr. Funte was adamant that the manner of death was homicide. Ray was asked how important it was to Shelton's defense that Dr. Funte admitted in his testimony that it was possible that Young's death was the result of suicide. Ray stated, "It was very important because I could argue it saying that she had said that." As it relates to why he did not consult with any experts on the manner of death, Ray stated that he did not because that was not his strategy in this case.

¶52. It is clear from Ray's testimony during the PCR motion hearing that he had a trial strategy he believed to be best suited to this case. He wanted to focus the jurors' attention on the "hysterical young lady" who was calling 911 for help and who had no motive to kill her sister's boyfriend. He did not want to focus any more attention on Dr. Funte's opinion or to appear combative with him on the stand. After the jury found Shelton guilty, it is clear that Ray's strategy was unsuccessful. In *Havard v. State*, 928 So. 2d 771, 790 (¶31) (Miss. 2006), the supreme court stated:

> With regard to all three of the above assignments of attorney error, we reiterate that counsel is given broad discretion to plan a trial strategy and to carry it out. In *Branch*, we said, "When evaluating the overall performance of counsel, counsel must make strategic discretionary decisions including whether or not to file certain motions, call certain witnesses, ask certain questions or make certain objections." *Branch* [*v. State*], 882 So. 2d [36,] 52 [(Miss. 2004)]. Such decisions do not necessarily equate to ineffective assistance simply because

35

counsel was not successful at trial. **These trial decisions by counsel did not decidedly result in performance deficient under *Strickland*, but even if they did, the inquiry does not end there. "Once a deficient performance is shown, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different**. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Woodward* [*v. State*], 635 So. 2d [805,] 808 [(Miss. 2006)] (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

(Emphasis added). Even if I were to find that Ray's trial strategy in this case constitutes a "performance deficient under *Strickland*," in light of the statistics contained in the studies Dr. Funte relied upon, I find that Shelton did not show that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." This issue is without merit.

> B.     *Counsel's failure to review critical GSR evidence available in discovery and failure to prepare to contest the GSR evidence is not reversible error.*

¶53.     Shelton next argues that her trial counsel's performance relative to addressing the GSR evidence was deficient. She points to counsel's failure to open the GSR kit that was returned to the sheriff's department after testing was complete. She contends that if counsel had simply opened the kit and reviewed the contents, he would have discovered a conflict between the time of collection on the form and the time of collection in Williams' report. This failure, according to Shelton, constitutes counsel's failure to meet the objective standard of reasonableness. In support of her argument, Shelton points to *Payton v. State*, 708 So. 2d 559, 562 (¶9) (Miss.1998), where the supreme court explained:

There is no question that the defendant is entitled to a basic defense. *Triplett v. State*, 666 So. 2d 1356 (Miss.1995). As to what a basic defense may entail, the language from the *Triplett* Court is instructive:

> Basic defense in this case required complete investigation to ascertain every material fact about this case, favorable and unfavorable. It required familiarity with the scene, and the setting. It required through his own resources and process of the court learning the names of, and interviewing every possible eyewitness, and getting statements from each. It required prior to trial learning all information held by the state available to the defense through pre-trial discovery motions.

*Triplett*, 666 So. 2d at 1361.

¶54.    Ray admitted during his testimony at the PCR hearing that had he known about the conflict regarding the time the GSR samples were taken, he would have attempted to impeach Williams' testimony in that regard. However, on cross-examination, Ray testified that he did not want the jury to focus on the GSR that was found on Shelton's hands and clothes. Ray knew that this was a problem for his defense, especially in light of the conflicting statements Shelton had given law enforcement before he began representing her. Had he pressured Williams on the conflicting times, Ray testified:

> A.    Here's what would have happened. I would have crossed Officer Ramirez Williams about that. Oh, so this is different than what you said. I would have impeached his credibility. Mr. Jackson or Mr. Rogillio couldn't have gotten to that podium quick enough. So, it doesn't matter what time, did she have it on her hands, while they're looking at the jury. I know how they do. I've done it. They would have - -they would have made- -they would have said it doesn't matter what time it was taken, it was there. Now, obviously, like I told Mr. Carrington, I would have tried to pound on him about it, so if this is a problem I may have other problems. They would have -- they would have flipped it.

37

Q.     But as the Defense Attorney, part of your strategy, you wanted to kind of get past it so you could re-focus the jury on what you felt like you wanted them to focus on, right?

A.     I couldn't get Burchfield off the stand quick enough. I did not want them to keep hearing about the gunshot residue. I knew it was damning for my defense.

¶55.   Shelton contends that her defense was prejudiced by Ray's failure to place the conflict in times before the jury. She argues that it would have destroyed the "purported nexus between rubbing her hands and asking to use the bathroom and a desire to eliminate evidence would have been severed." Because the conflict was not put before the jury, according to Shelton, the State was able to argue in closing argument that these actions were "the actions of a guilty person." The defense could well have argued at trial, as she does in her PCR motion, that the wringing of her hands was a result of the stress of Young's death and the fact that she was being treated as a suspect. As noted above, however, part of the strategy used by Shelton's trial counsel was to minimize the GSR issue.

¶56.   Shelton also contends that counsel's performance was deficient because he did not consult experts in an effort to contest or rebut the State's GSR evidence. Jacob Burchfield, the analyst who conducted the gunshot residue analysis, testified at trial that his tests have three possible results: positive, indicative, or negative. He testified that he found particles indicative of gunshot residue on the back of both of Young's hands, but the results were negative for the palms of both Young's hands. He indicated that he found particles indicative of gunshot residue on the pajama pants and shirt collected from Shelton at the sheriff's

38

office. Burchfield found particles indicative of gunshot residue in samples collected from Shelton on the back and palm of her right hand and from the palm of her left hand. The results for the back of Shelton's left hand were negative. Burchfield then testified that you can get gunshot residue on you in one of three ways: firing a weapon, being in close proximity to a weapon at the time of discharge, or by handling something that has gunshot residue on its surface. Burchfield testified at trial that the test results from the hands of both Young and Shelton showed that both had five particles indicative of gunshot residue. Burchfield did not testify that his tests could reveal the identity of the person who pulled the trigger.

¶57.    At the PCR hearing, Shelton called Crystina Vachon to testify as an expert in the field of GSR analysis. She agreed with Burchfield's testing and his report, which shows the result of the tests. Vachon testified that "particle counting" cannot be used to determine whether a person's hands were used to fire a weapon or were in close proximity to a weapon at the time of discharge, nor can it be used to learn where the person handled something with gunshot residue on its surface. Thus, Vachon disagreed with Burchfield's testimony at trial and at the PCR hearing that the person who fired the weapon would be expected to have more particles on their hand.[15] Again, however, Burchfield never testified that "particle

---

[15] That was the last question asked of Burchfield at trial on redirect examination by the State. There was no objection by the defense. Burchfield did not attempt to identify Shelton as the person who fired the weapon. Burchfield testified that both Shelton and Young had the same number of particles indicative of GSR on their hands.

counting" could be used to conclusively distinguish between the three ways a person's hands could test positive for GSR. The trial court found that neither the testimony presented by Shelton at the hearing nor the exhibits produced by Shelton produced anything that was not before the trial jury.

¶58. I find that the trial court did not err by concluding that Shelton had failed to meet both prongs of the *Strickland* test regarding Ray's handling of the GSR issue.

> ### C. Counsel was not ineffective for failing to prepare and present defense evidence.

¶59. Under this portion of Shelton's claim of ineffective assistance of counsel, she points to two specific instances where her counsel failed in his duty to her. First, Shelton points to a statement taken by law enforcement from Christy Langley.[16] Langley gave a recorded statement on October 26, in which she said she had been outside a friend's house at 930 Mhoon Valley Road for five to ten minutes when she heard a gunshot. Langley stated that about two minutes later, she heard a girl "hollering" somebody's name. Langley stood outside for two to three minutes and went back inside. That is when Langley heard on the scanner that there was an accidental shooting. At that point she went back outside trying to see if she could see or hear anything. Langley did not really know where the shooting took place. She saw a vehicle pull up before the sheriff's department got there. A woman got out of the car and started screaming, and then the sheriff's deputies arrived. Langley stated that

---

[16] In October 2009, her name was Christy Langley, but her name changed by the time of the PCR evidentiary hearing to Christy Hall.

she could not see too much from where she was standing. She told law enforcement that she could not pinpoint where the shot was fired.

¶60. On April 13, 2022, Hall was called by Shelton to testify at the PCR hearing. She authenticated the transcript of her recorded statement that she had given to law enforcement back in 2009. Hall testified to the events consistent with her prior recorded statement. On cross-examination, Hall admitted that there could have been an "argument or commotion" before she went outside that night. Further, she testified that she did not know whom she heard screaming.

¶61. On appeal, Shelton argues that her trial counsel was given a copy of Langley/Hall's recorded statement as part of discovery. Shelton contends that because her trial counsel did not interview this potential witness, his assistance was ineffective. Further, she contends that her defense was prejudiced because Langley/Hall's testimony could have rebutted parts of Deputy T. Williams' testimony at trial.

¶62. During cross-examination of Williams at trial, Shelton's attorney questioned Williams about the course of his investigation and his desperate efforts to come up with a motive or theory of what happened. Shelton's counsel suggested that the first theory that "came up" in this case was that there had been a "scuffle" between Young and his girlfriend, Ketina, and that Shelton had come to the "aid and protection of her younger sister and shot Mr.

Young."[17] Williams agreed that this thought came up in the "wee hours of October 17" in his second interview with Shelton. Shelton responded that she did not shoot Young.

¶63. Williams testified as to what he found at the scene on the night Young was shot. There was never any other evidence or testimony to identify whether there was, in fact, an altercation or who was involved in the altercation, if it occurred. However, there was nothing in Langley/Hall's statement that would have changed the result of the trial. She was some distance away and had no idea of what may have happened five to ten minutes before she heard the gunshot. This claim is without merit.

¶64. Shelton also claims that her trial counsel was ineffective for failing to prepare to have "Danelle Young's Despairing Letter" admitted into evidence to support her suicide defense. Shelton attached her own affidavit to her PCR motion concerning the undated letter. According to her affidavit, Shelton stated that she found the letter in Treasure's baby book around Thanksgiving in 2009. Shelton stated, under oath, that Young visited her in the hospital when Treasure was born. Shelton said the next time she saw Young was when she was in the hospital in Meridian for seizures in the summer of 2009. According to Shelton's affidavit, the next time she saw Young was during the visit in October when he came to visit her sister on Ketina's birthday, immediately before his death on October 16. Shelton testified

---

[17] On direct examination, Williams testified that he had walked the driveway area, and between five to ten yards from where the body was located, there was an area where the gravel was "badly disturbed." He found a rubber band with some hair in it in this spot. A photo of the area Williams described was admitted into evidence.

that she gave a copy to Ray and kept the original safe but does not state a date that she gave the letter to her attorney.

¶65. Shelton introduced evidence during the PCR proceedings that showed a handwriting expert had identified Young as the person who had written the letter. She claims that Ray rendered ineffective assistance of counsel by not being prepared to introduce this important piece of evidence at trial. In her brief on appeal, counsel argues that the contents of the letter shows that it was written within five months of Young's death and is relevant because

> [t]he note is an expression of despair over the prospect of living his life without the love of Ms. Shelton's sister, Ketina. It contains the haunting words, statement: "These are my last words."
> . . . .
>
> Defense counsel's failure to prepare deprived the jury of the opportunity to weigh Mr. Young's words for their bearing on his intention and motivation to take his own life.

¶66. Ray was deposed and also gave testimony during the PCR evidentiary hearing. He testified that this letter was important to Shelton's defense of suicide. Ray confirmed that he had disclosed the letter to the State prior to trial, but he could not give a date of disclosure. Ray admitted that he had not consulted with a handwriting expert in an effort to authenticate the letter. When asked what he had done to prepare to introduce the letter at trial, Ray said that he intended to introduce the letter through Shelton or her sister Ketina, both of whom could authenticate Young's writing and signature. Ray indicated that he really felt like he needed to introduce it through Shelton's testimony because the letter was addressed to her, and she was the one who could testify as to when and where she found the letter. When Ray

43

was asked whether he knew, in advance of trial, whether Shelton would testify, he stated, "I felt like she would." During the deposition, Ray produced two pages from a notebook that contained the pros and cons of Shelton testifying at trial. He testified that he and Shelton reviewed these before Shelton made the decision to testify. The pages were admitted as an exhibit to Ray's deposition. Ray's deposition was attached to Shelton's motion for summary judgment, however, the exhibits were not attached. As a result, I do not know whether the letter was on this list of pros and cons or what was discussed prior to her decision not to testify.[18]

¶67.    After Shelton made the decision that she would not testify at trial, Ray contends that he then tried to introduce the letter through Ketina. Ray testified that the trial court sustained the State's objection and would not allow him to introduce the letter. In my review of the trial transcript, I do not find where the admissibility of this letter was argued and decided at trial. However, in her affidavit, Shelton states:

> On the second day of trial I went home to bring the original note to the courthouse. I saw Mr. Ray discussing the note with the prosecutor while the jury was not present. Judge Kitchens was on the bench.

In her PCR motion, Shelton acknowledges that she was present and that Judge Kitchens ruled against her in Ray's effort to introduce the letter.

---

[18] Ray testified that prior to trial, he expected Shelton to testify. In her affidavit, Shelton claims she would have testified had she known she needed to do so in order for the letter to be admitted into evidence. However, Shelton had the burden of proof on this issue and failed to produce the notes she and Ray reviewed prior to her decision not to testify.

¶68. In any event, Ray provided testimony that while he had not consulted with a handwriting expert, he was prepared to introduce the letter through the testimony of either Shelton or Ketina. Concerning the authentication of writings, the court stated in *Brown v. State*, 965 So. 2d 1023, 1028 (¶16) (Miss. 2007):

> Rule 901 of the Mississippi Rules of Evidence governs the authentication of documents in our trial courts. Specifically, subsection (a) of that Rule states that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The Rule goes on to explain that a written document may be authenticated by a lay witness familiar with handwriting not acquired for purposes of litigation, or by an expert by comparing specimens that have been previously authenticated. *See* M.R.E. 901(b)(2), (3). Rule 901 further provides that testimony of a witness with knowledge is sufficient authentication that a matter is what it is claimed to be. M.R.E. 901(b)(1).

Accordingly, Ray's plan to introduce the letter through either Shelton or Ketina was not deficient preparation. They were perfectly competent to authenticate Young's handwriting and signature. The fact that Shelton elected not to testify does not justify a finding that Ray was ineffective. Further, it appears that Ray then attempted to introduce the letter through Ketina. For some reason that is not shown in the trial transcript, the trial court sustained the State's objection to the introduction of the letter. Shelton appears to argue that Ray should have sought out a handwriting expert before trial. Still, I do not know whether the trial court ruled that the document could not be authenticated by Ketina. Since the rule seems to make clear that Ketina, after laying the proper foundation, could have authenticated the document, the trial court's ruling would have been upon a different basis. Without more, I cannot find

45

that Ray's plan to introduce the letter through one of these witnesses constitutes a "failure to prepare" or deficient performance.[19] This issue is without merit.

> D.    *The totality of the circumstances does not require that*
> *relief be granted for ineffective assistance of counsel.*

¶69.    Shelton asserts that when considering the totality of the circumstances, we must find that her trial counsel's performance was deficient and prejudiced her defense. I disagree. Because I have found that Shelton failed in her burden to prove her trial counsel's performance in any of the areas discussed above was both "deficient and prejudicial," this issue is also without merit. *See Bradford v. State*, 391 So. 3d 1254, 1273 (¶56) (Miss. Ct. App. 2024).

## Conclusion

¶70.    I would find that the trial court was not clearly erroneous in its decision to deny Shelton post-conviction collateral relief and would affirm the trial court's order.

**LAWRENCE AND WEDDLE, JJ., JOIN THIS OPINION.**

---

[19] While I would agree that Ray failed to obtain an on-the-record ruling from the court on this issue so that the issue could be addressed on direct appeal, that is not an issue presented by Shelton's PCR motion.